IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
November 14, 2018 Session

## AURELIO GARCIA SANCHEZ v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Macon County**
**No. 2012-CR-13      Brody N. Kane, Judge**

_____

## No. M2017-02253-CCA-R3-PC

_____

The Petitioner, Aurelio Garcia Sanchez, appeals the Macon County Criminal Court's denial of his petition for post-conviction relief from his convictions of five counts of rape of a child and resulting effective sentence of one hundred twenty-five years to be served at one hundred percent. On appeal, the Petitioner contends that he received the ineffective assistance of trial counsel. Based upon the oral arguments, the record, and the parties' briefs, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, P.J., and ALAN E. GLENN, J., joined.

Greg W. Traylor, Lafayette, Tennessee, for the appellant, Aurelio Garcia Sanchez.

Herbert H. Slatery III, Attorney General and Reporter; Sophia S. Lee, Senior Counsel; Tom P. Thompson, Jr., District Attorney General; and Justin Harris, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## I.  Factual Background

On August 23, 2011, the Petitioner gave a statement to police in which he confessed to sexually abusing his stepdaughter, B.S.,[1] and the police arrested him. In February 2012, the Macon County Grand Jury indicted the Petitioner for five counts of rape of a child and five counts of aggravated sexual battery. The State later dismissed the aggravated sexual battery charges and proceeded to trial on the five counts of rape of a

_____

[1] It is the policy of this court to refer to minor victims by their initials.

child. The Petitioner filed a motion to suppress his statement. The trial court held a hearing and denied the motion.

On direct appeal of the Petitioner's convictions, this court described the proof at trial as follows:

> B.S. testified that she was fourteen-and-a-half years old at the time of trial and in the ninth grade. She stated that [S.K.][2] was her mother and that she had one brother and six step-brothers. Her brother, G.A.S., was three years old at the time of trial, born in December 2010. B.S. recalled that, after he was born, she lived with [S.K.], the Defendant, and her brother. [S.K.] was recovering from the birth of G.A.S. at the time, but [S.K.] resumed working in early 2011. The Defendant, who had been living with B.S. and [S.K.] for two or three years, stayed home with B.S. while [S.K.] went to work.
>
> B.S. testified that, while her mother was at work, the Defendant touched her thighs and "messed with" her, causing her to feel uncomfortable. She testified that the Defendant took her clothes off and touched her vagina with his fingers and his tongue. He also touched her breasts with his tongue. She stated that this happened "a lot," estimating over twenty times.
>
> B.S. testified that, on one occasion, in the living room of their residence, the Defendant touched her legs, took off her clothes, put his tongue on her vagina and "spread my vagina apart" with his fingers. B.S. testified that this happened "over thirty" times in the living room. She testified that, on one occasion in her mother's room, the Defendant took her clothes off and put his tongue on her vagina. The Defendant kept his clothes on. On another occasion in her mother's room, the Defendant took off his clothes except for his boxer shorts. Again, the Defendant took off B.S.'s clothes and put his tongue on her vagina. He also used his fingers to spread apart her vagina. B.S. recounted that these events happened in her bedroom "about twice" and in the living room and her mother's room "a lot." She estimated that it happened over thirty times in the living room and over thirty times in the bedroom. B.S. testified that on one occasion in the living room, the Defendant kissed her, took her clothes off and put his tongue on her vagina.

---

[2] In order to protect the victim's identity, we will refer to her mother by her mother's initials.

B.S. testified that after each incident she would wash herself with a rag in the bathroom. She stated that the Defendant would "spy" on her in the bathroom, so she began locking the door. The Defendant told B.S. that he loved her more than her mom.

B.S. testified that she did not speak Spanish and only spoke English with the Defendant, and he never had difficulty understanding her.

On cross-examination, B.S. testified that the Defendant, while living with her and her mother, asked her to clean the house, do dishes, and encouraged her to do her homework. She agreed that she and the Defendant had arguments when she did not clean the house before he came home. B.S. stated that she told a friend about the Defendant touching her in August 2011. She said she wanted to tell someone because it did not feel right to her.

[S.K.], B.S.'s mother, testified that she was married to the Defendant and had a son with him. She testified that the Defendant lived with her for four or five years. She recalled accompanying the Defendant to his interview when he spoke to Sheriff's deputies. After that interview, [S.K.] did not return to her home, and she spoke to the Defendant by telephone three days later. During their phone conversation, the Defendant admitted that he "touched" and "licked" B.S. but denied having had sex with B.S. [S.K.] stated that the Defendant was thirty-five years old at the time.

[S.K.] testified that while packing up the Defendant's belongings she found, inside a pocket of his coat in a laundry basket, his underwear and B.S.'s underwear "tied together." She reported her finding to Chief [Terry] Tuck.

On cross-examination, [S.K.] agreed that she was still married to the Defendant and had known him for at least four years before they got married. She stated that B.S. and the Defendant got along "all right" and she agreed that he encouraged B.S. to do her homework and her chores. She agreed that B.S. and the Defendant sometimes had disagreements but stated that she had never seen the Defendant act inappropriately toward B.S.

[S.K.] testified that she talked with the Defendant on the phone three days after his arrest. He called her from jail and told her that he had touched and licked B.S. but again denied having sex with her. [S.K.]

agreed that she did not tell investigators about this phone call until the week before trial. [S.K.] agreed that she did not know how B.S.'s underwear got into the laundry basket and she was making an assumption that the Defendant was involved.

Chief Terry Tuck testified that he worked for the Macon County Sheriff's office and that he, Lieutenant [Bill] Cothron, and Ms. [Carolyn] Stoops interviewed the Defendant, assisted by Sergeant [Pete] Ritchie, and that the initial interview lasted approximately forty-five minutes. Chief Tuck said that he spoke English with the Defendant and never considered getting an interpreter because the Defendant appeared to understand the questions and responded appropriately. The Defendant told Chief Tuck he had been molested as a young boy by a cousin or uncle. The Defendant admitted having sexual contact with B.S.

Chief Tuck wrote out the Defendant's statement and the Defendant signed it at the bottom of the statement. Chief Tuck read the Defendant's statement aloud for the jury:

> About two months ago I was at home with my kids. My wife left for work about 9:45 p.m. . . . A lot of times I would already be asleep and I would wake up during the night and [B.S.], my step daughter, would be up watching television. [B.S.] was supposed to be in bed, and when I would get up, I would catch her watching television. I told her she was supposed to be in bed, and she would come up close to me trying to sweet talk me into letting her stay up. There were about five occasions that this happened, and I let myself get carried away with [B.S.]. I would stroke her hair. And on these five occasions I pulled her pajama bottoms down and would lick her vaginal area. I'm sorry that this happened and I let myself go too far with [B.S.]. Ever since this started, this has been bothering me and I'm glad it's over and I'm sorry that this happened.

Chief Tuck recalled that when the Defendant started to give his statement, Lieutenant Cothron was present and then was called away so Sergeant Ritchie joined the interview in his place.

On cross-examination, Chief Tuck agreed that the written statement was not the Defendant's "exact words" from the interview. He recalled

that, about an hour into the interview, Sergeant Ritchie asked the Defendant if he was hungry and left the interview to get food for the Defendant. Chief Tuck denied that anyone present in the interview room yelled at or touched the Defendant. He agreed that the Defendant initially denied any sexual contact with B.S. Chief Tuck told the Defendant repeatedly that he was not telling the truth. He agreed that there was no recording of the interview, although the technology to do so was available. He also recalled that he had a discussion with Lieutenant Cothron about recording the interview.

Sergeant Pete Ritchie testified that he worked for the Gallatin Police Department and assisted Chief Tuck in the investigation of this case. Sergeant Ritchie recalled that he was present in the interview room with Chief Tuck when the Defendant admitted to having sexual contact with B.S. He was also present when the Defendant was advised of his Miranda rights, and Sergeant Ritchie advised the Defendant as well. Sergeant Ritchie described the tone of the interview as professional and respectful and testified that the Defendant was treated fairly. Sergeant Ritchie identified the waiver of rights form signed by the Defendant, which Sergeant Ritchie witnessed.

The Defendant testified that he was born in Mexico and lived there until he was sixteen years old. He had "not much, very little" understanding of English when he came to the United States. The Defendant testified that he first moved to Kentucky where he worked in tobacco farming for three months. He then moved to Murfreesboro, Tennessee to live with his father and his father's wife. The Defendant met and was married to his first wife in Murfreesboro for three years, and then they divorced. He moved to Carthage, Tennessee where he met and married his second wife. They were married for eight years and then divorced, after which he met and married his third wife, [S.K.]. At the time they married, the Defendant was working as a bricklayer. The Defendant and [S.K.] lived together with [S.K.]'s daughter, B.S. He testified that his relationship with B.S. was "good" at first, but later they started to fight and argued frequently about her schooling and homework. The Defendant recalled that things got worse between B.S. and him after he and [S.K.] had a son together.

The Defendant testified that he did not do any of the sexual things that B.S. claimed that he had done. He denied touching her vagina with his fingers or his mouth and said that B.S.'s accusations were made out of "hate." The Defendant recounted that, shortly before B.S. made her

- 5 -

accusation against him in 2011, the two had fought about her joining the cheerleading squad and her wanting a boyfriend.

The Defendant recalled his interview at the sheriff's office. Investigators, he said, never offered to contact an interpreter or discussed his understanding of the English language with him. The Defendant testified that he was never read his Miranda rights. The Defendant testified that he had difficulty understanding the investigators' questions and that he never signed anything. The Defendant testified that he felt threatened by the investigators and that Lieutenant Cothron got angry with him and lunged at him. The Defendant testified that when this occurred he began crying. The Defendant denied that Sergeant Ritchie questioned him. The Defendant testified that the investigators misinterpreted his statement that he had been abused five times by his cousin and incorrectly believed that he had abused B.S. five times. The Defendant denied that it was his signature on the statement and waiver of rights form.

On cross-examination, the Defendant testified that he did not learn of B.S.'s allegations until the day after he was interviewed. He said that B.S, his wife, and law enforcement were all fabricating their statements against him to "make a perfect crime."

State v. Aurelio Garcia Sanchez, No. M2014-01997-CCA-R3-CD, slip op. at *6-9 (Tenn. Crim. App. at Nashville, Dec. 4, 2015), perm. app. denied (Tenn. Apr. 7, 2016).[3]

The jury convicted the Petitioner as charged of five counts of rape of a child. After a sentencing hearing, the trial court ordered that he serve consecutive sentences of twenty-five years for each conviction for a total effective sentence of one hundred twenty-five years to be served at one hundred percent.

On direct appeal of his convictions, the Petitioner argued that the trial court erred by denying his motion to suppress his statement to police because the officers did not provide him with an interpreter and because he did not knowingly and intelligently waive his rights; that the evidence was insufficient to support the convictions because, in pertinent part, the victim did not testify about the specific dates on which the offenses occurred; and that the trial court erred by imposing consecutive sentencing. Id., slip op. at *10-11, 12-13, 16. This court affirmed the Petitioner's convictions and effective sentence. Id., slip op. at *17.

---

[3] It is the policy of this court to use citations to Westlaw. However, for whatever reason, the Westlaw citation for this case is not available.

After our supreme court denied the Petitioner's application for permission to appeal, he filed a timely pro se petition for post-conviction relief, claiming that he received the ineffective assistance of counsel because trial counsel did not hire a handwriting expert to investigate whether the signatures on the waiver of rights form and his statement to police had been forged; failed to obtain a bill of particulars in order to distinguish between the five counts alleged in the indictment and failed to require the State to make an election of offenses; and did not present any mitigating evidence at sentencing "in order to seek a lower sentence." The post-conviction court appointed counsel, and counsel did not file an amended petition.

At the evidentiary hearing, the Petitioner testified through an interpreter that he had been in jail "[n]o more than two days" when trial counsel first met with him. They met for about twenty minutes and talked about "the situation that was happening," but the Petitioner had difficulty communicating with trial counsel because the Petitioner's English was "really low." Trial counsel's meetings with the Petitioner were "one after another" from August 2011 to February 2012. Thereafter, trial counsel met with him about every three months until his trial. At some point, trial counsel showed him a waiver of rights form and his statement to police, both of which he supposedly signed on August 23, 2011. He immediately told trial counsel that the signatures on the documents were not his signatures. Trial counsel told the Petitioner they would "talk about that later." However, "later never arrived." Post-conviction counsel showed the Petitioner his August 23, 2011 jail "booking sheet." The Petitioner acknowledged that he signed the booking sheet and that the signature on the booking sheet was his signature.

The Petitioner testified that he never discussed a handwriting expert with trial counsel because he "never thought that one existed" and that trial counsel never mentioned a handwriting expert to him. At trial, the Petitioner testified that the signatures on the waiver of rights form and his statement to police were not his signatures.

The Petitioner testified that trial counsel said he was going to file a motion to suppress but that they did not talk about a defense strategy. They also did not talk about any of the victim's claims of abuse occurring on a specific day or in a specific year. A "sexologist" interviewed the Petitioner in jail a few months before trial, but trial counsel did not call the sexologist as an expert witness at trial. The Petitioner thought he also met with a "psychiatrist." Trial counsel told the Petitioner that the allegations against him were "strong," and trial counsel "constantly" tried to get the Petitioner to accept a plea offer. Trial counsel even used the Petitioner's family to try to convince him to accept an offer. The Petitioner said that he refused because he had lost trust in trial counsel and

that "I didn't see as far as his part that he would ever help me about this situation that's happening."

The Petitioner testified that trial counsel could have called the Petitioner's coworker, Kale Copas, to testify on his behalf at sentencing and that he did not think trial counsel interviewed any witnesses for this case. At the conclusion of the Petitioner's testimony, he read a statement to the post-conviction court. In the statement, he maintained that he signed only his booking sheet. He also said that trial counsel "failed" him and that he was innocent of sexually abusing the victim.

On cross-examination, the Petitioner acknowledged that trial counsel wanted him to take a plea offer rather than go to trial and that trial counsel was going to have to argue to the jury that the victim, S.K., Chief Tuck, Ms. Stoops, Lieutenant Cothron, and Sergeant Ritchie were all lying. The Petitioner stated that his main complaint about trial counsel was that trial counsel "should have investigated about my signatures to explain to me that there existed a professional that could have cleared up that document." Trial counsel also knew Sergeant Ritchie's testimony was "completely false" because Sergeant Ritchie was not present during the Petitioner's police interview. However, trial counsel "ignored that." The State reminded the Petitioner that everyone in the interview room, except the Petitioner, said that Sergeant Ritchie was present during the Petitioner's interview. The Petitioner responded, "This was clearly a twisted allegation."

Trial counsel testified that during his representation of the Petitioner, the Petitioner "was consistent" that the signatures on the waiver of rights form and his statement to police were not his signatures. Trial counsel said the State's case was based "almost one hundred percent" on the Petitioner's confession and "involved not only whether he signed those documents or not, but did he say those things or not." Chief Tuck, Sergeant Ritchie, Lieutenant Cothron, and Ms. Stoops all said the Petitioner admitted to sexually abusing the victim. The Petitioner told trial counsel that Lieutenant Cothron gave him a voice stress test and went to McDonald's to get him a hamburger, fries, and a drink. However, trial counsel knew from previous cases that Sergeant Ritchie always conducted the voice stress tests. Moreover, the other witnesses said Sergeant Ritchie, not Lieutenant Cothron, went to McDonalds for the Petitioner. Trial counsel told the Petitioner that the Petitioner was "mistaken," but the Petitioner insisted that Lieutenant Cothron conducted his voice stress test and went to McDonalds. Trial counsel said, "Mr. Sanchez is just totally dogmatic and adamant that that's the way it is."

Trial counsel testified that the Petitioner thought the Petitioner needed a mental evaluation. Trial counsel stated, "I hadn't really been having that kind of problem with him, but nevertheless this is a very serious case, so we did it." A psychologist evaluated the Petitioner, and the Petitioner told the psychologist that he did not sign the waiver of

rights form or his statement to police. The psychologist did not find that the Petitioner had any mental illnesses, so trial counsel did not consider an insanity or diminished capacity defense. Trial counsel did not recall consulting any other experts. He said that he did not know anything about a "sexologist" and that "I don't know where that comes from."

Trial counsel testified that he did not consider hiring a handwriting expert because four people from four different agencies said that the Petitioner signed the waiver of rights form and his statement. Therefore, in order for the Petitioner to have been correct, all four of those people had to be lying. Regarding the Petitioner's claim that he did not sign those documents, trial counsel stated, "I didn't believe him and I don't believe him." Trial counsel filed a motion to suppress the Petitioner's statement, but trial counsel did not argue in the motion that the Petitioner's signatures were forged. Instead, trial counsel argued that the police failed to video-record the Petitioner's interview and failed to provide him with an interpreter. Trial counsel said he thought the police put "pressure" on the Petitioner and "took advantage" of the Petitioner during the Petitioner's interview. However, trial counsel did not believe the Petitioner's claim that he did not sign the waiver of rights form or his statement. Therefore, trial counsel did not cross-examine the police officers about the Petitioner's signatures being forgeries. Trial counsel stated that even if he had hired a handwriting expert, "the State might have produced [an expert] that said it was his signature."

Trial counsel acknowledged that the victim's testimony about the abuse and when it occurred was not specific and that he did not seek an election of offenses after the State's proof. He also did not file a motion for a bill of particulars before trial. The State provided him with discovery materials, though, including B.S.'s video-recorded interview. Trial counsel stated, "[S]o I sort of knew what she was going to say. And that's kind of the nature of these sexual offenses." At sentencing, the trial court was "pretty much locked in" to sentencing the Petitioner to twenty-five years for each conviction, and the only issue was whether the Petitioner would serve the sentences concurrently or consecutively. Trial counsel said that the trial judge in this case "typically sentenced consecutive" in sexual abuse cases and that he did not have any hope for concurrent sentencing.[4] Trial counsel did not have any witnesses testify about the Petitioner's work history or background at the sentencing hearing. However, the Petitioner had testified about his background at trial, and some of the information was in his presentence report. Trial counsel acknowledged that he did not argue any mitigating factors.

---

[4] The judge at trial and sentencing did not preside over the Petitioner's post-conviction case.

On cross-examination, trial counsel testified that he talked with the State before trial. Therefore, he knew what the State's evidence was going to be at trial. Trial counsel said that he had been practicing law almost thirty-eight years and that he had never filed a motion for a bill of particulars. He explained,

> Usually, discovery is specific enough. And like I told [post-conviction counsel] a minute ago, you know, that's kind of the nature of these sexual offenses. Usually the indictment says a date to date, you know. If there's some law out there I can learn, I'm always willing to learn, but I just don't know it right now.

Trial counsel also did not know a strategic reason for requesting an election of offenses at the close of the State's proof as opposed to the close of the case itself. Trial counsel acknowledged that the only mitigating factor he could have argued at sentencing was factor (1), that the Petitioner's conduct neither caused nor threatened serious bodily injury.

At the conclusion of trial counsel's testimony, he advised the post-conviction court that the State offered the Petitioner a ten-year sentence at one hundred percent in exchange for a guilty plea to aggravated sexual battery. Based on the evidence, trial counsel advised the Petitioner to accept the offer. Trial counsel said that he "did everything" to get the Petitioner to accept the offer but that the Petitioner refused.

In a written order, the post-conviction court denied the petition for post-conviction relief. Regarding trial counsel's failure to hire a handwriting expert, the post-conviction court stated that it had inspected the Petitioner's waiver of rights form, written statement, and booking sheet and that the court "could find no obvious differences" in the signatures on the documents. The court noted that the Petitioner did not present any expert testimony about the signatures at the evidentiary hearing. The court accredited trial counsel's testimony that the ultimate issue in this case was whether the Petitioner made the statement confessing to sexually abusing the victim, not whether he signed the statement. The court found that the Petitioner failed to demonstrate deficient performance "when faced with a confession made in the presence of four (4) different people from four (4) different entities" and failed to demonstrate prejudice because he did not present expert testimony at the hearing.

As to trial counsel's failure to file a motion for a bill of particulars, the post-conviction court accredited trial counsel's testimony that he knew from the State's discovery materials and the victim's video-recorded interview what the victim was going to say at trial. Thus, the court found that the Petitioner failed to demonstrate deficient performance or prejudice. Regarding trial counsel's failure to request an election of

offenses, the post-conviction court stated that this court addressed the issue in the Petitioner's direct appeal of his convictions and that this court ruled in favor of the State. Therefore, the post-conviction court refused to revisit the issue. Finally, as to trial counsel's failure to present mitigating proof at sentencing, the post-conviction court noted that the trial court stated at sentencing that it had considered all of the enhancement and mitigating factors. Thus, the post-conviction court found that trial counsel's failure to argue mitigating factors was not deficient performance and did not prejudice the Petitioner.

## II. Analysis

On appeal, the Petitioner maintains that he received the ineffective assistance of counsel because trial counsel did not file a motion for a bill of particulars before trial or request an election of offenses at the close of the State's proof, failed to consult a handwriting expert to investigate whether the signatures on the waiver of rights form and his written statement were forged, and failed to present any mitigating evidence at sentencing. He also contends that the cumulative effect of trial counsel's errors deprived him of the effective assistance of counsel. The State argues that the Petitioner has failed to show that he is entitled to relief. We agree with the State.

To be successful in a claim for post-conviction relief, a petitioner must prove the factual allegations contained in the post-conviction petition by clear and convincing evidence. See Tenn. Code Ann. § 40-30-110(f). "'Clear and convincing evidence means evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" State v. Holder, 15 S.W.3d 905, 911 (Tenn. Crim. App. 1999) (quoting Hodges v. S.C. Toof & Co., 833 S.W.2d 896, 901 n.3 (Tenn. 1992)). Issues regarding the credibility of witnesses, the weight and value to be accorded their testimony, and the factual questions raised by the evidence adduced at trial are to be resolved by the post-conviction court as the trier of fact. See Henley v. State, 960 S.W.2d 572, 579 (Tenn. 1997). Therefore, the post-conviction court's findings of fact are entitled to substantial deference on appeal unless the evidence preponderates against those findings. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001).

A claim of ineffective assistance of counsel is a mixed question of law and fact. See State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999). We will review the post-conviction court's findings of fact de novo with a presumption that those findings are correct. See Fields, 40 S.W.3d at 458. However, we will review the post-conviction court's conclusions of law purely de novo. Id.

When a petitioner seeks post-conviction relief on the basis of ineffective assistance of counsel, "the petitioner bears the burden of proving both that counsel's

performance was deficient and that the deficiency prejudiced the defense." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland v. Washington, 466 U.S. 668, 687 (1984)). To establish deficient performance, the petitioner must show that counsel's performance was below "the range of competence demanded of attorneys in criminal cases." Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). To establish prejudice, the petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694. Further,

> [b]ecause a petitioner must establish both prongs of the test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim. Indeed, a court need not address the components in any particular order or even address both if the [petitioner] makes an insufficient showing of one component.

Goad, 938 S.W.2d at 370 (citing Strickland, 466 U.S. at 697).

Turing to the instant case, the Petitioner claims that trial counsel was ineffective because he failed to file a motion for a bill of particulars. Tennessee Rule of Criminal Procedure 7(c) provides, "On a defendant's motion, the court may direct the district attorney general to file a bill of particulars so as to adequately identify the offense charged." There are three purposes for a bill of particulars: (1) to provide the defendant with information about the details of the charge if necessary for the preparation of the defense; (2) to avoid prejudicial surprise at trial; and (3) to enable the defendant to preserve a claim of double jeopardy. State v. Byrd, 820 S.W.2d 739, 741 (Tenn. 1991). The Advisory Commission Comments to Tennessee Rule of Criminal Procedure 7(c) state that the purpose of the bill of particulars is to enable the defendant to know "precisely what he or she is charged with" and "is not meant to be used for purposes of broad discovery." If the needed information is in the indictment or has been provided by the State in some other satisfactory form, no bill of particulars is required. State v. Hicks, 666 S.W.2d 54, 56 (Tenn. 1984) (citing 1 C. Wright, Federal Practice and Procedure, Criminal, § 129 (1982)).

Here, trial counsel testified that he talked with the State and received discovery materials, including the victim's video-recorded interview, before trial; therefore, he knew what the State's evidence was going to be and what the victim was going to say at trial. The Petitioner has offered no explanation as to how trial counsel's failure to file a motion for a bill of particulars impaired his defense. Therefore, he has failed to demonstrate that he is entitled to relief.

- 12 -

In a related argument, the Petitioner claims that trial counsel was ineffective because he failed to request an election of offenses from the State after the State's proof. However, as noted by the post-conviction court, this court addressed the issue of election of offenses in its analysis of the sufficiency of the Petitioner's convictions on direct appeal, stating:

> During closing argument, the State made the following election of offenses:
>> Count 1: "in the living room, . . . [the Defendant] took off [B.S.'s] clothes, spread her vagina with his fingers and he licked her vagina."
>>
>> Count 2: "is also in the living room. The same [acts], [the Defendant] removes [B.S.'s] clothes, spreads her vagina and licks her vagina."
>>
>> Count 3: "is in her mom's bedroom, [the Defendant's] bedroom. [B.S.] testifies that he removes her clothes . . . spreads her vagina, licks her vagina."
>>
>> Count 4: "this time [the Defendant is] in his boxers, removes all his other clothes. [B.S.] testified to that, spread her vagina, licked her vagina."
>>
>> Count 5: "is the time that he kissed her. . . . It was in the living room, removed her clothes, spread her vagina, licked her vagina."
>
> As to the Defendant's argument that the victim never testified about the specific dates when the offenses took place, we agree with the State that its election of offenses provided the Defendant with sufficient notice about the specific sexual acts for which he was prosecuted. "This Court has consistently held that when the evidence indicates the defendant has committed multiple offenses against a victim, the prosecution must elect the particular offense as charged in the indictment for which the conviction is sought." State v. Brown, 992 S.W.2d 389, 391 (Tenn. 1999) (citations omitted). Because of the difficulty faced by young victims of sexual abuse when testifying, this Court has adopted the policy that "[a]ny description that will identify the prosecuted offense for the jury is sufficient." Id. at 392 (citing State v. Shelton, 851 S.W.2d 134, 138 (Tenn. 1993)). In the present case, the victim testified that the offenses occurred around the time her brother was born in December 2010 and during the time when her

mother went back to work, following her maternity leave, in the beginning of 2011. The victim made her accusations against the Defendant in August 2011.

Aurelio Garcia Sanchez, No. M2014-01997-CCA-R3-CD, slip op. at *14-15.

The Petitioner, referring to this court's opinion, contends that "the timing of the election was key" and that the State's election during its closing argument was "too late" for him to respond to the election. He claims that if the State had made its election of offenses before he presented his defense, then he "could have addressed the specific instances upon which the State was relying." However, as noted by the State, the Petitioner makes no argument as to how he would have responded to the proof for each count so as to have changed the jury's verdict. Accordingly, we must conclude that the Petitioner has failed to demonstrate that trial counsel was deficient for failing to request an election of offenses at the close of the State's proof or that he was prejudiced by any deficiency.

As to the Petitioner's claim that trial counsel was ineffective for failing to hire a handwriting expert, we too have looked at the signatures on the waiver of rights form, the Petitioner's written statement, and the Petitioner's booking sheet. Like the post-conviction court, we can find "no obvious differences" between the signatures on the waiver and the statement and the signature on the booking sheet. In any event, the Petitioner did not have a handwriting expert testify at the evidentiary hearing. Generally, "[w]hen a petitioner contends that trial counsel failed to discover, interview, or present witnesses in support of his defense, these witnesses should be presented by the petitioner at the evidentiary hearing." Black v. State, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). We may not speculate on what benefit the witness might have offered to the Petitioner's case. Therefore, we agree with the post-conviction court that the Petitioner has failed to demonstrate deficient performance or prejudice.

Regarding the Petitioner's claim that trial counsel was deficient for failing to present mitigating evidence at sentencing, the presentence report stated that the victim received nine months of counseling after the abuse. In addressing whether the Petitioner's sentences should be served concurrently or consecutively, the trial court said,

> Crimes against our children are among the most horrendous in our society, because if we don't protect our children, we will have no society. And our legislature has made very, very clear that if you have multiple convictions for child sex offenses such as rape of a child then consecutive sentencing is proper.

- 14 -

I'm sure the parties in this courtroom are aware, I've handled these cases before. I've done consecutive sentencing before and it has been upheld by the Court of Appeals and the Supreme Court before when I've done this type of sentencing.

The trial court then addressed whether consecutive sentencing was proper in the Petitioner's case. The trial court stated that it had reviewed all thirteen mitigating factors in Tennessee Code Annotated section 40-35-113, the court's notes from the trial, and the "history and presentence report" and that "this Court finds no mitigating factors in this particular instance."

The trial court addressed consecutive sentencing pursuant to Tennessee Code Annotated section 40-35-115(b)(5), which provides,

The defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims[.]

The trial court found that the time span of the abuse, the Petitioner's relationship to the victim, and the "mental damage" to the victim justified consecutive sentencing. On direct appeal of his convictions, this court upheld the trial court decision to order consecutive sentencing pursuant to Tennessee Code Annotated section 40-35-115(b)(5). Aurelio Garcia Sanchez, No. M2014-01997-CCA-R3-CD, slip op. at *16.

At the evidentiary hearing, post-conviction counsel suggested that trial counsel was deficient for failing to argue that mitigating factor (1), that the defendant's criminal conduct neither caused nor threatened serious bodily injury, applied in this case. See Tenn. Code Ann. § 40-35-113(1). However, the trial court stated that it had reviewed and rejected all thirteen mitigating factors. We note that this court has upheld a trial court's rejection of mitigating factor (1) when the defendant sexually abused minors. See State v. McKnight, 900 S.W.2d 36, 55 (Tenn. Crim. App. 1994); State v. John Ray Thompson, Nos. M2003-00487-CCA-R3-CD & M2003-01824-CCA-R3-CD, 2004 WL 2964704, at *19-20 (Tenn. Crim. App. at Nashville, Dec. 20, 2004) (stating that "every rape is physically and mentally injurious to the victim" and that "'[i]t is difficult to conceive of any factual situation where the rape of a child would not threaten serious bodily injury'") (quoting State v. Edward Earl Huddleston, No. 02C01-9706-CC-00228, 1998 WL 67684, at *3 (Tenn. Crim. App. at Jackson, Feb. 20, 1998)). On appeal, the Petitioner does not explain what other mitigating evidence trial counsel could have presented at sentencing

- 15 -

that would have resulted in the trial court's ordering the Petitioner to serve his five twenty-five-year sentences concurrently. Thus, we conclude that the Petitioner has failed to demonstrate that trial counsel was deficient or that he was prejudiced by any deficiency.

Finally, the Petitioner contends that the cumulative effect of trial counsel's errors warrants a reversal of his convictions. However, we find no merit to this claim.

### III. Conclusion

Based upon the oral arguments, the record, and the parties' briefs, we affirm the post-conviction court's denial of the petition for post-conviction relief.

_____
NORMA MCGEE OGLE, JUDGE